## Bank of Willard, et al. v. Pennsylvania & Kentucky Fire Brick Company.

(Decided April 24, 1917.)

### Appeal from Rowan Circuit Court.

1. Bills and Notes—Defenses.—Commercial paper accepted after maturity is subject to such defenses and equities as the maker would have in the hands of the original holder, including the defense of payment, provided, however, that such payment was made without notice or knowledge of the transfer of the note by the payor.

2. Bills and Notes—Pledgee of Commercial Paper.—A pledgee of commercial paper sustains no better position to it than a purchaser, and if the pledgee accepts it after maturity he takes it subject only to such rights as a purchaser after maturity would acquire.

3. Bills and Notes.—There is no law requiring the payor of an obligation to take it up or to see that it is destroyed at the time he pays it.

4. Appeal and Error—Finding of Chancellor.—When the evidence upon issues of fact determined by a chancellor is conflicting, and the mind is left in doubt as to the truth of the matter, this court will be governed by the finding of the chancellor upon such issues.

W. E. PROCTOR and D. B. CAUDILL for appellant Fitzpatrick.

THEOBALD & THEOBALD for appellant Bank of Willard and Phoenix Bank.

YOUNG & CLAY and JAMES CLAY for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellee and defendant below, the Pennsylvania & Kentucky Fire Brick Company, a Kentucky corporation,

on May 20, 1907, executed its four promissory notes, aggregating $3,958.00, payable to one J. W. Shumate, in the amounts and at the times following: $1,152.00 four months thereafter; $500.00 six months thereafter; $1,153.00 eight months thereafter, and $1,153.00 twelve months thereafter. To secure the payment of each and all of them the company executed a mortgage to Shumate on certain real estate in Rowan county consisting of lands and the mineral clay under certain other lands, which mortgage was duly acknowledged and put to record in the Rowan county clerk's office. At that time the Olive Hill National Bank of Olive Hill, Ky., was a going concern, and Shumate was, or shortly thereafter became, its president. He had been prior to that time, and in a way continued to be after that, a sort of agent for the Pennsylvania & Kentucky Fire Brick Company, as well as for some auxiliary companies which had been organized for the purpose of acquiring interests in fire brick clay, and the further purpose of developing and manufacturing it into fire brick. But this appears to have been a mere incident to his many varied interests.

Some time in 1909 the affairs of the Olive Hill National Bank, of which Shumate was president, became so embarrassed that it went into liquidation, and Shumate was appointed its liquidating agent. After the collapse of that bank it appears that he organized the Phoenix Bank, of which he became president, and after a few months it met a similar fate to that which befell its predecessor, the Olive Hill National Bank.

About May 20, 1911, Shumate disappeared from that community, and has never been heard from since. After this it was discovered that his business affairs were in a greatly entangled condition, and that evidences of his duplicity, perfidy and fraud were multifarious. Until this discovery it uncontradictorily appears that he sustained the reputation of an honest man, and seems to have had the confidence of his business associates and all persons with whom he had dealings or transactions.

The notes which the appellee brick company had executed and secured by its mortgage were kept by Shumate in the Olive Hill National Bank, where he did business, and some of the original ones were not paid in cash at the time they became due, but were either then or shortly thereafter renewed by others of the same denominations. It also appears that perhaps the first renewals, or at any rate some of them, were themselves renewed for a

second time after they became due. Under the belief, as the record shows by the testimony of the brick company, that Shumate would either destroy or preserve the old notes as they would be renewed or paid, they would not be taken up by the company, but were left, as it supposed, in the vaults of the Olive Hill National Bank.

On January 5, 1911, Shumate executed his note for $1,152.00, due in four months, to the appellant, Bank of Willard, and to secure it deposited with the bank as collateral security one of the old notes of the brick company for the same amount, dated May 20, 1909, and due two months thereafter. In other words, the collateral note at that time was past due one year, six months and fifteen days.

On January 18, 1911, the Olive Hill National Bank executed its note to the Phoenix Bank for the sum of $1,500.00, due three months thereafter, and pledged as collateral security thereto a note of the appellee brick company to Shumate for $1,152.00, of date September 18, 1909, and due four months thereafter. It will be observed that at the time the Olive Hill National Bank executed this note it had gone into liquidation and ceased to do business and that Shumate was its liquidator, and the collateral note at the time it was deposited as such was exactly one year past due.

On December 5, 1910, Shumate executed his note to appellant, Mrs. Fitzpatrick, for the sum of $550.00, due three months thereafter, and to secure it she holds a note for $1,152.00 executed by appellee brick company to Shumate of date September 20, 1908, due four months thereafter, which was one year, ten months and fifteen days after it matured. Shumate also discounted a note for $1,152.00 which the appellee brick company had executed to him on September 18, 1909, due in four months to the Commercial Bank of Grayson, Kentucky, which was contested below on the ground that it had been paid to Shumate by the brick company, but that contest has been abandoned on this appeal.

This suit was filed by the Bank of Willard against Shumate, the appellee brick company, and the other banking corporations heretofore mentioned, seeking to collect its debt from Shumate. The brick company and the other corporations by appropriate pleadings manifested their respective debts and asked the same relief as against Shumate and the brick company, which included a prayer for the sale of the mortgaged property.

The answer of the brick company (which term we have heretofore used and will continue to use to designate the appellee, Pennsylvania & Kentucky Fire Brick Company) acknowledged the execution of the notes, but alleged that they were transferred by Shumate to the various claimants after they became due, and after they had been paid by it to Shumate after they had matured, and when the brick company had no notice or knowledge of their transfer as collateral or otherwise. These allegations were denied, which completed the issue. The evidence was taken by depositions, and upon submission the court adjudged that the petition of the Bank of Willard, and the cross-petitions of the other appellants, be dismissed, but rendered judgment in favor of the Commercial Bank of Grayson for its debt, from which judgment the appellants prayed an appeal and the brick company also prayed an appeal from the judgment against it in favor of the Commercial Bank of Grayson. As intimated above, the appeal prayed by the appellee from the judgment against it in favor of the Commercial Bank of Grayson has been abandoned, and the only questions to be considered now are as to the correctness of the court's ruling and its finding that the notes held by the respective appellants were paid by the brick company after they became due and without notice or knowledge of their transfer, or that they had been transferred after they had been paid.

Upon the issue of payment the evidence is confined almost entirely to the deposition of J. B. Hammond, who was vice president of the brick company, and who resides and did reside at Bolivar, Pennsylvania. He says that during the year 1907 the brick company, through him, paid one of the notes for $1,153.00 and the one for $500.00, and that the others were renewed. He exhibits checks to Shumate as follows: One for $500.00, July 20, 1909; $300.00, July 23, 1909; $504.00, July 27, 1909; $251.67, November 18, 1909; and $250.00, December 23, 1909, and shows conclusively that he endorsed to Shumate a note for $500.00 executed by a different corporation known as Kentucky Fire Brick Company, which was subsequently paid, which checks, together with the Kentucky Fire Brick Company note, aggregate $2,305.67, which, with the other notes which he claims to have paid, makes the sum of $3,958.67, or only 67 cents more than the total aggregate of the amount of the notes. He also shows checks for much smaller sums which he issued to Shu-

mate, but they were for taxes and other items not con-nected with this indebtedness.

.It is seriously insisted that upon some points the testimony of Hammond appears to be a little hazy, and that this, together with the fact that the notes when paid were not taken up, but were permitted to remain in the custody of Shumate or under his control, are circum-stances pointing to the fact that the notes were not in fact paid. While this might indicate business careless-ness, we know of no law requiring the payor of a note to demand its delivery to him when payment is made, and a failure to do it cannot in the least alter the rights of the parties, including a subsequent holder when he obtains the note after it has been paid. That at least some of the collateral notes executed by the brick company in-volved in this suit have been paid, either by cash or by renewals, is perfectly manifest from the testimony, and the history of Shumate's questionable methods very clearly explains the way the appellants became possessed of their collateral notes.

It is insisted on behalf of the Phoenix Bank that the collateral note which it accepted from the Olive Hill Na-tional Bank was taken by the latter before it became due, and that although transferred and deposited with the Phoenix Bank after its maturity, the latter took not only an indefeasible title to the note, but also took it free from all equities, including that of payment, which the maker may have had to it. This contention is so radically op-posed to the law governing the rights of parties to com-mercial paper that we deem it unnecessary to enter into anything like an elaborate discussion of the subject. A transferee from a prior transferee occupies no safer position than does a transferee from the original payee. The controlling fact always is whether the note was due at the time it was transferred, and not the relation of the transferer to it. The general rule is stated in 7th Cyc. 952, to be:

"If from the face of the paper it appears that the whole or a part of the amount represented thereon is past due, that fact is of itself sufficient notice to put a purchaser on inquiry."

Further along it is stated that the fact that the note is past due does not affect the purchaser's title to it, which, however, is a different question from the one af-fecting the right of the maker to defenses thereto. The

same rule is adhered to by this court in the case of Greenwell v. Haydon, 78 Kentucky 332, wherein it is said:

"It is so well settled as to have become one of the fundamentals of commercial law, that commercial paper in the hands of one who receives it after maturity is subject to all the equities between the parties to which it would have been subject in the hands of the person from whom the holder received it, whether he had notice of such equities or not. . . . These rules relate to the right of the holder growing out of his ownership of the paper, and not to his title to the paper itself. . . . In cases belonging to either of these classes no question arises as to the title of the holder. He is conceded to be the owner of the obligation. The question is, what is the extent of his right of recovery?" etc.

The same question was before this court in the still later case of Austin v. First National Bank of Scottsville, 150, Ky. 113, wherein the law upon the subject is stated in this paragraph from the opinion:

"The appellee bought the note after it was overdue; and under section 58 of the negotiable instrument law it was subject to the same defenses as if it were non-negotiable."

We conclude, then, that the Phoenix Bank, having taken the note after it became due, although from one to whom it had been endorsed before maturity, occupies no better position than if it had taken the note at the time it did from Shumate, the payee.

Considering now the Fitzpatrick branch of the case, it is testified by her that her debt was originally created on October 5, 1908, at which time Shumate borrowed from her $800.00 and executed to her a note for that sum, and at that time deposited the collateral note of the brick company upon which she sues, which was not then due, and that Shumate afterwards, on December 5, 1910, paid on that note $250.00 and executed the note for the balance of $550.00 upon which she sues, and that she is therefore entitled to recover from the brick company at least to the extent of the amount of her debt. It will be remembered that her collateral note is dated September 20, 1908. At that time the Olive Hill National Bank, of which Shumate was president, was a going concern. By proper process the clerk of the court below has transmitted to this court for our inspection her collateral note, and an inspection of it reveals that it bears the discount number "2977," and in the blank on its face following the

word "due" is written "Jan. 20, '09." Moreover, on the back of it appears this endorsement: "Pay to the order of the Olive Hill National Bank, Olive Hill, Kentucky. J. W. Shumate." That note matured January 20, 1909, and it is shown by Hammond that it was renewed at that time, and by other testimony that the discount number and due date referred to are both in the handwriting of the then cashier of the Olive Hill National Bank. It is also shown by the books of that bank kept in the due course of business that it was being held at the date of Mrs. Fitzpatrick's original note by the Olive Hill National Bank as a part of its assets, and furthermore it is shown by the books that it was renewed on January 20, 1909, and the renewal note accepted as payment thereof by the bank. In addition to this, it is shown by Hammond and another witness that some time after the absconding of Shumate the witnesses had a conversation with Mrs. Fitzpatrick in which she stated, in substance, that about the time of the execution of her present note for $550.00 she became uneasy and demanded not only payment of part of her then $800.00 note, but security for the balance, and that as a result of her demands Shumate made the payment of $250.00 and gave her a note for the balance and then deposited with her for the first time the collateral note of the brick company upon which she sues. With the evidence in this condition the chancellor found that she was evidently mistaken about the collateral having been deposited with her as of the date of her original note for $800.00. Upon such issues of fact it is the rule governing this court on appeal that where under the evidence as a whole the truth of the matter involved is doubtful, the doubt will be resolved in favor of the finding of the chancellor. Cases from this court are almost innumerable sustaining this rule, one of the latest being that of Farmer v. Cornett, 174 Ky. 560, and cases therein referred to. Under this rule, conceding the testimony of Mrs. Fitzpatrick to be sufficient to create a doubt in our minds upon this issue of fact, we would still be without authority to reverse the finding of the chancellor relative thereto; and it may be here stated that the same rule, as we view the record, would prevent us from disturbing the judgment under which the chancellor found that the payments testified to by the witness Hammond were actually made as he states.

Counsel for appellants indulge in considerable discussion of the fact that Shumate sustained some minor rela-

tion to the brick company and had previous to that time been more or less active in assisting it to acquire its properties in Rowan county, and in a way they insist that the brick company should share the burden of his defalcations and his business peculations, but we are furnished with no legal reason why this should be done. In the particular matter of the notes in question as between himself and the brick company, it was a plain business transaction.    The parties dealt with each other at arms' length, and it is fully established that the brick company shared the belief of the appellants in the strict integrity and honesty of Shumate.    Everybody was duped alike by him, as he seems to have played no favorites in pursuing his questionable methods.    Corporations and individuals, males and females, were alike the victims of his duplicity.    The radius of his swindlings was limited only by the extent of his acquaintances, and his baited and destructive torpedoes were fired alike at friend and foe.

It results therefore that the judgment should be and it is affirmed.